SUMMARY OPINION AND ORDER; NOT INTENDED FOR PUBLICATION
IN THE OFFICIAL REPORTERS

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

REBECCA TRESSLER,

        Plaintiff,

        v.

NATIONAL RAILROAD PASSENGER
CORPORATION,

        Defendant.

Civil Action No. 09-cv-2027 (RLW)

## MEMORANDUM OPINION[1]

Plaintiff Rebecca Tressler ("Tressler") is a railroad engineer employed by the National Railroad Passenger Corporation, more commonly known as Amtrak ("Amtrak"). She brings this lawsuit against Amtrak, asserting a number of employment-based claims. Specifically, Tressler pursues the following remaining claims against Amtrak: (1) Hostile Work Environment in Violation of Title VII and the D.C. Human Rights Act ("DCHRA") (Counts I and II); (2) Retaliation in Violation of Title VII and the DCHRA (Counts III and IV); (3) Hostile Work Environment/Constructive Demotion in Violation of Title VII and the DCHRA (Counts V and

---

[1] This unpublished memorandum opinion is intended solely to inform the parties and any reviewing court of the basis for the instant ruling, or, alternatively, to assist in any potential future analysis of the *res judicata*, law of the case, or preclusive effect of the ruling. The Court has designated this opinion as "not intended for publication," but this Court cannot prevent or prohibit the publication of this opinion in the various and sundry electronic and legal databases (as it is a public document), and this Court cannot prevent or prohibit the citation of this opinion by counsel. *Cf.* FED. R. APP. P. 32.1. Nonetheless, as stated in the operational handbook adopted by our Court of Appeals, "counsel are reminded that the Court's decision to issue an unpublished disposition means that the Court sees no precedential value in that disposition." D.C. Circuit Handbook of Practice and Internal Procedures 43 (2011).

SUMMARY OPINION AND ORDER; NOT INTENDED FOR PUBLICATION
IN THE OFFICIAL REPORTERS

VI); and (4) Violation of the Federal Employers' Liability Act ("FELA") (Count VII).[2]  This matter is before the Court on Amtrak's Motion for Summary Judgment (Dkt. No. 52).  For the reasons set forth below, the Court concludes that Amtrak's Motion must be **GRANTED**.

## BACKGROUND

The overall facts surrounding Tressler's claims are largely undisputed.  Amtrak operates a nationwide rail network system serving over 500 destinations in 46 states and three Canadian provinces.  (Dkt. No. 52 ("Def.'s Mem.") at 1-2).  From 1992-2010, Amtrak also operated trains owned by the Virginia Railway Express ("VRE").  (*Id.* at 2).  Tressler began her employment with Amtrak in 1987 as a Passenger Locomotive Engineer ("Engineer").  (Dkt. No. 52-3 ("Tressler Dep.") at 97).  In 2004, Tressler bid on and was awarded an Engineer position on a VRE route between Fredericksburg, Virginia and Washington, D.C.  (*Id.* at 101; Dkt. No. 52-4 ("Scala Dep.") at 17).  In so doing, Tressler displaced a more junior Engineer, but this was a common practice for Amtrak employees.   (Tressler Dep. at 77-79, 193-94).  At the time, Tressler was the first and only female Engineer with a regularly scheduled assignment on the Fredericksburg line.  (Dkt. No. 53-6 ("Tressler Decl.") at ¶ 4).

From January 13, 2006 to June 22, 2006, Tressler alleges that a male passenger, Mr. Draper, "stalked" her on the VRE during his morning commute to work.  (Tressler Dep. at 120).  Tressler believes Mr. Draper touched her on her back, blocked her path to the operating cab door with his bags, occasionally opened the operating cab door, stared at her through the window, and took pictures of her.  (*Id.* at 121-23).  Tressler reported Mr. Draper's behavior to an Amtrak conductor in mid-February 2006 and to her immediate supervisor in March 2006.  (*Id.* at 125).

---

[2]      Originally, Tressler also asserted a defamation claim, but the Court dismissed that claim in its Order Granting (in Part) Amtrak's Partial Motion to Dismiss.  (Dkt. No. 34).

She also filed a police report around that time.  (Dkt. No. 52-6 ("5/25/06 Email")).  During the police investigation, Amtrak removed Tressler from the VRE and placed her on special duty so she would not have to interact with Mr. Draper.  (Tressler Dep. at 134-36).  After conducting their investigation, the police could not substantiate Tressler's accusations.  (Dkt. No. 52-5 ("Bodtmann Dep.") at 62).  However, a police investigator recommended that Tressler be able to cover the cab door window to minimize distractions.  (Dkt. No. 52-7 ("6/9/06 Union Letter")).  Because VRE, not Amtrak, owned the train Tressler operated, Amtrak sent VRE a letter asking that Tressler be permitted to cover the window.  (Tressler Dep. at 131; Dkt. No. 52-8 ("6/19/06 Amtrak Letter")).  VRE denied that request by letter dated June 22, 2006, citing security reasons.  (Dkt. No. 52-9 ("6/22/06 VRE Letter")).  However, Mr. Draper stopped riding Tressler's train at the same time, and Tressler confirmed that June 22, 2006 was the last time she saw Mr. Draper on her train.  (Dkt. No. 52-10 ("12/19/06 EEOC Charge") at ¶¶ 19, 23).

Since Tressler was not permitted to cover the cab window, she alleges that she had to sit in an uncomfortable position in the cab to avoid Mr. Draper's view.  (*Id.* at ¶ 7; Dkt. No. 52-11 ("5/3/07 EEOC Charge") at ¶ 16).  As a result, Tressler alleges she suffered back pain, headaches, and numbness in her hands.  (5/3/07 EEOC Charge at ¶ 16).  She began seeing a chiropractor for these symptoms on April 24, 2006, who identified her symptoms as stress-related and indicated the position in her chair exacerbated the condition.  (*Id.*).  By October 10, 2006, Tressler stopped seeing her chiropractor because the pain was mostly gone.  (*Id.*).

On September 14, 2006, Tressler injured her ankle when she slipped exiting a train by the engine ladder.  (Tressler Dep. at 274; Dkt. No. 52-12 ("Disability Claim").  On December 5, 2006, Tressler signed a Disability Claim Form stating that she hurt her ankle and that she stopped working on October 25, 2006 because of the injury.  (*Id.*).

SUMMARY OPINION AND ORDER; NOT INTENDED FOR PUBLICATION
IN THE OFFICIAL REPORTERS

On December 19, 2006, Tressler filed an administrative charge with the Equal Employment Opportunity Commission (EEOC) against Amtrak and VRE asserting that she had been subjected to a hostile work environment and retaliation since January 2006.  (12/19/06 EEOC Charge).  Her supporting declaration focused almost exclusively on her interactions with Mr. Draper.  (*Id.*)  She later amended her original Charge on May 3, 2007, to include allegations dating back to August 2004 and additional assertions that occurred since filing her original charge.  (5/3/07 EEOC Charge).  After May 2007, Tressler did not file any other charges with the EEOC, nor did she otherwise seek to amend her prior charges.

In January 2007, Tressler bid on and was awarded an Engineer position in the Washington, D.C. yard.  (Tressler Dep. at 105).  Although this position paid the same hourly rate as her prior position on the VRE, Tressler asserts that the job offered fewer hours per week, which, in turn, had the effect of cutting her pay in half.  (*See id.* at 305, 309).  Tressler also contends that the schedule for her new position was less desirable because it required her to work nights and weekends.  (5/3/07 EEOC Charge at ¶ 2).  During this time, Tressler knew she could bid on any open position, displace another Engineer, or bid on the extra list.  (Tressler Dep. at 106-07, 261-62, 306-07).  She also could have waited to bid on another position because newly open positions were advertised on a weekly basis.  (*Id.* at 119).  Ultimately, Tressler stayed in the Washington, D.C. yard for approximately ten months, until October 2007, when she bid on and was awarded a position in the Northeast Corridor.  (*Id.* at 308-10).

Following her transfer, Tressler was not paid beginning sometime in October 2007 through February 2008.  (Dkt. No. 20 ("Am. Compl.") at ¶ 29).  Apparently, Tressler had failed to submit her timecards during much of this period, which Amtrak requires before it can issue a paycheck.   (Tressler Dep. at 228).  As of January 30, 2008, Tressler still had not provided any

time records for her work.  (Dkt. No. 52-17 ("Mazeika Dep.") at 28; Dkt. No. 52-14 ("1/3/08 Email")).  Ultimately, after she did so in February 2008, Amtrak provided Tressler with a check for all of the time she worked from October 2007 through February 2008.  (Tressler Dep. at 230).

Upon moving to the Northeast Corridor, Tressler was required to learn the new route and "qualify," by riding trains with fellow Engineers.  (Dkt. No. 54 ("Pl.'s Opp'n") at 19).  In the course of "qualifying," Tressler rode with several different Engineers, including co-worker Michael Flora, with whom she had previously ridden.  (Dkt. No. 52-2 ("Marcelle Decl.") at Ex. B).  On March 19, 2008, Tressler reported to Amtrak that Mr. Flora had sexually assaulted her while riding together on the train on March 14, 2008.  (*Id.*; Tressler Dep. at 218-20).  The same day it received Tressler's report, Amtrak's Dispute Resolution Office began investigating the incident.  (Marcelle Decl. at ¶ 10).  Amtrak also notified Amtrak Police, which proceeded to conduct its own investigation.  (*Id.*).  Amtrak completed its investigation in less than one week, suspended Mr. Flora, issued charges against Mr. Flora, and scheduled a disciplinary hearing to take place.  (*Id.* at ¶ 10-11).  Following those disciplinary proceedings, Amtrak terminated Mr. Flora's employment effective May 16, 2008.  (Dkt. No. 52-16 ("Flora Discipline") at 13-18).

After reporting the assault, Tressler was excused from work from March 19 through 27, 2008.  (Tressler Dep. at 336).  Once she returned, on April 2, 2008, Tressler reported that she saw sexually explicit graffiti in the Engineer compartment of her train.  (Marcelle Decl. at ¶¶ 12-13).  Amtrak immediately removed the graffiti, and the DRO investigated the graffiti and reported it to Amtrak Police.  (Tressler Dep. at 250; Marcelle Decl. at ¶ 13).  On April 14, 2008, Tressler then reported additional sexually-based graffiti on April 14, 2008, which Amtrak again removed while the DRO and Amtrak Police continued their investigation.  (Marcelle Decl. at ¶ 14).  Tressler believes that some of the graffiti was directed at her, because she saw references to

her first name, "Becky," and her initials, "RAT." (Tressler Dep. at 240). However, not all of the graffiti was sexually-based or sexually inappropriate. Tressler also saw graffiti of a nonsexual nature, including graffiti consisting of "Turkle is number one," "I love Tom Mazeika," "stuff about the Poconos," and pictures of fish. (*Id.* at 243-45).

On April 17, 2008, Amtrak issued notices to employees in the Northeast Corridor stating it had received reports of sexually-graphic and inappropriate graffiti on train equipment and devices, and that the incidents were being investigated by Amtrak Police. (Marcelle Decl. at ¶ 15; Dkt. 52-18 ("Graffiti Notices")). Amtrak's notices expressly stated that such behavior would not be tolerated and directed employees to report graffiti immediately to their supervisor who would contact Amtrak Police. (*Id.*). According to Tressler, however, graffiti continues to appear, as recently as October 2011. (Pl.'s Opp'n at 10). Finally, Tressler asserts that her manager, Mr. Mazeika, improperly suspended her pay for a second time in May 2008, on the grounds that Tressler was taking too long to "qualify" for her route. (Pl.'s Opp'n at 15).

Tressler ultimately received her "right-to-sue" notice from the EEOC on July 30, 2009, (Compl. at ¶ 24), and she filed her Complaint initiating this action on October 28, 2009.

## ANALYSIS

### A. Standard of Review

Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009). A genuine issue of material fact exists if the evidence "is such that a reasonable jury could return a verdict for the nonmoving party." *Steele*

SUMMARY OPINION AND ORDER; NOT INTENDED FOR PUBLICATION
IN THE OFFICIAL REPORTERS

*v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). While the

Court views all facts in the light most favorable to the nonmoving party in reaching that

determination, *Keyes v. Dist. of Columbia*, 372 F.3d 434, 436 (D.C. Cir. 2004), the nonmoving

party must nevertheless provide more than "a scintilla of evidence" in support of its position.

*Anderson*, 477 U.S. at 252. To establish a genuine issue of material fact, the nonmoving party

must demonstrate—through affidavits or other competent evidence, FED. R. CIV. P. 56(c)(1)—

that the quantum of evidence is such that a "jury could reasonably find for the [nonmoving

party]." *Anderson*, 477 U.S. at 252.


**B.   Hostile Work Environment Based On Sexual Harassment (Counts I and II)**

Title VII forbids an employer from discriminating against any individual because of sex.

*Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (quoting 42 U.S.C. § 2000e-2(a)(1)). In turn, an

employer cannot create or condone "a hostile or abusive work environment if the harassment is

sufficiently abusive to affect a term, condition, or privilege of employment." *Davis v. Coastal

Int'l Sec., Inc.*, 275 F.3d 1119, 1122 (D.C. Cir. 2002) (internal quotations omitted). To establish

a *prima facie* hostile work environment claim—as required to defeat an employer's summary

judgment motion—a plaintiff must demonstrate that: (1) she is a member of a protected class; (2)

she was subjected to unwelcome harassment based upon sex; (3) the harassment unreasonably

interfered with the plaintiff's work performance and created an intimidating, hostile, or offensive

working environment; and (4) there is some basis to impose liability on the employer. *Id.* at

1122-23; *Kilby-Robb v. Spellings*, 522 F. Supp. 2d 148, 162-63 (D.D.C. 2007).

SUMMARY OPINION AND ORDER; NOT INTENDED FOR PUBLICATION
IN THE OFFICIAL REPORTERS

Importantly, it must be clear that the allegedly harassing conduct complained of was based on a protected characteristic—*i.e.*, the plaintiff's sex. *Davis*, 275 F.3d at 1123; *Kilby-Robb*, 522 F. Supp. 2d at 163. This is significant because:

> Everyone can be characterized by sex, race, ethnicity or (real or perceived) disability; and many bosses are harsh, unjust and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeal.

*Bryant v. Brownlee*, 265 F. Supp. 2d 52, 63 (D.D.C. 2003) (quoting *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002)). Stated differently, "hostile behavior, no matter how unjustified or egregious, cannot support a claim of hostile work environment unless there exists some linkage between the hostile behavior and the plaintiff's membership in a protected class." *Na'im v. Clinton*, 626 F. Supp. 2d 63, 73 (D.D.C. 2009).

In addition, "[n]ot all abusive behavior, even when it is motivated by discriminatory animus, is actionable." *Stewart v. Evans*, 275 F.3d 1126, 1133 (D.C. Cir. 2002) (internal quotations omitted). Rather, these standards are "sufficiently demanding to ensure that Title VII does not become a general civility code" and to filter out "the ordinary tribulations of the workplace." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotations omitted). As the D.C. Circuit has explained, "[s]exual harassment creates a hostile environment only if it is so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment." *Taylor v. Solis*, 571 F.3d 1313, 1318 (D.C. Cir. 2009). By contrast, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (quoting *Harris*, 510 U.S. at 21). In determining whether a work environment is impermissibly "hostile," the Court must look to the totality of circumstances, including "the

SUMMARY OPINION AND ORDER; NOT INTENDED FOR PUBLICATION
IN THE OFFICIAL REPORTERS

frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 21; *Faragher*, 524 U.S. at 788.

Finally, as "the legal standard for establishing discrimination under the DCHRA is substantively the same as under Title VII," courts properly consider hostile work environment claims under Title VII and the DCHRA coextensively. *Elhusseini v. Compass Group USA, Inc.*, 578 F. Supp. 2d 6, 18 (D.D.C. 2008) (citing *Sparrow v. United Air Lines Inc.*, 216 F.3d 1111, 1114 (D.C. Cir. 2000)).[3]

Here, Tressler principally relies on two acts to support her hostile work environment claims: (1) the appearance of sexually-based graffiti on Amtrak trains, which Tressler believes was directed at her; and (2) a sexual assault against Tressler by a male coworker, Mr. Flora. (Pl.'s Opp'n at 7-12). She also contends that the Court should consider other "facts" in conducting its analysis, but she fails to elaborate on any of these additional "facts" and she completely fails to explain how they support her hostile work environment claims. Instead, she raises these issues through nothing more than a conclusory parenthetical devoid of any tangible arguments or evidence: "[T]hose incidents must be viewed collectively with the other facts in the record (*e.g.* unfair allotment of overtime opportunities, damage to personal property, stoppage of pay, etc.)." (Pl.'s Opp'n at 8). As the D.C. Circuit has explained, "a district court should not be obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make [its] own analysis and determination of what may, or may not, be a genuine issue of material fact." *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145,

---

[3]     This parallelism is equally true with respect to Tressler's retaliation and constructive demotion claims, which are also pled concurrently under both Title VII and the DCHRA. Thus, just as with Tressler's hostile work environment claims, the Court's analysis on those other claims applies to her claims under both federal and District of Columbia substantive law.

SUMMARY OPINION AND ORDER; NOT INTENDED FOR PUBLICATION
IN THE OFFICIAL REPORTERS

151 (D.C. Cir. 1996) (internal quotations omitted).   To the extent that Tressler believes additional incidents or acts support her claims, she was required to specifically address those issues and to support her arguments with admissible evidence.   She did not.   Therefore, just as Tressler has done, the Court will confine its discussion of her hostile work environment claims to the two specific incidents noted above.[4]

First, Tressler contends that she was subjected to a hostile work environment due to the appearance of what she believed to be "sexually explicit graffiti"—graffiti that she argues is sufficient by itself to establish liability.  (Pl.'s Opp'n at 8-10).  According to Tressler, not only did she observe graffiti that consisted of sexual references and drawings of male and female anatomy, but some of the graffiti was also directed specifically at her, ostensibly using her first name, "Becky," and her initials, "RAT."  (Tressler Dep. at 240).  However, as Amtrak correctly notes, much of the graffiti Tressler observed was not related to her or directed at her whatsoever, nor was it sexual in nature—she also saw graffiti consisting of "Turkle is number one," "I love Tom Mazeika," "stuff about the Poconos," and pictures of fish.  (*Id.* at 243-245).  To be sure, this type of graffiti cannot be used to support a claim of hostile work environment based on sex.

But even with respect to the graffiti that does appear to have been sexual in nature, Amtrak could only be found liable for those actions if it "knew or should have known of the harassment and failed to implement prompt and appropriate corrective action."  *Curry v. Dist. of Columbia*, 195 F.3d 654, 660 (D.C. Cir. 1999).  Here, the undisputed evidence demonstrates that,

---

[4]       Further, Amtrak addressed at least some of these additional "facts" in its moving papers—explaining why those alleged incidents could not establish an actionable hostile work environment.  (*See* Def.'s Mem. at 14-17).  Tressler failed to respond to Amtrak's arguments, and the Court therefore treats those particular arguments as conceded. *Newton v. Office of the Architect of the Capitol*, 840 F. Supp. 2d 384, 397 (D.D.C. 2012) ("When a party files an opposition addressing only certain arguments raised in a dispositive motion, a court may treat those arguments that the non-moving party failed to address as conceded."); *Day v. D.C. Dep't of Consumer & Regulatory Affairs*, 191 F. Supp. 2d 154, 159 (D.D.C. 2002).

SUMMARY OPINION AND ORDER; NOT INTENDED FOR PUBLICATION
IN THE OFFICIAL REPORTERS

once Tressler reported the graffiti, Amtrak took swift and appropriate action to address the problem. Amtrak promptly removed the graffiti and reported the issue to Amtrak Police, and Amtrak Police began investigating the graffiti. (Tressler Dep. at 250; Marcelle Decl. at ¶ 13). Amtrak also issued written notices to its employees emphasizing that graffiti would not be tolerated and instructing that any graffiti was to be immediately reported to management for appropriate investigation. (Marcelle Decl. at ¶¶ 14-15; Mazeika Dep. at 80-81); Graffiti Notices). Specifically, Amtrak's notices advised employees as follows:

> [Y]ou are reminded that company policy strictly prohibits offensive graffiti, pictures, cartoons and other materials based on an individual's gender . . . or other personal characteristic protected by law. Therefore sexually graphic and inappropriate graffiti WILL NOT BE TOLERATED. All graffiti of any nature MUST IMMEDIATELY be reported to your supervisor, who in turn will report it to the Amtrak Police. Any graffiti found on locomotives and coaches must also be documented on the appropriate MAP form.

(Graffiti Notices) (emphasis in original). Despite all this, Tressler argues that Amtrak's actions fell short because it "made no changes to its policies regarding graffiti" that were designed to prevent graffiti from reappearing. (Pl.'s Opp'n at 9). This argument is unavailing. Not only does Tressler seem to overlook the fact that Amtrak already had a policy in place prohibiting graffiti on its trains and in the workplace, but she also ignores Amtrak's efforts to reemphasize that policy by issuing the written notices outlined above.

Under the circumstances, the Court concludes that Amtrak took amply reasonable steps to address the graffiti—both by removing and investigating any graffiti that was discovered, and also by striving to prevent the appearance of any graffiti in the first place. Therefore, even if the graffiti Tressler observed were deemed sufficiently "severe or pervasive" to create a "hostile" work environment, the Court concludes that no reasonable jury could find Amtrak responsible for such conduct.

Second, Tressler argues that Amtrak created and/or condoned a hostile work environment because she was the victim of a sexual assault by her former coworker, Mr. Flora.  (Pl.'s Opp'n at 10-12).  At the outset, Amtrak does not dispute that Mr. Flora engaged in some type of inappropriate sexual conduct towards Tressler.  Amtrak argues, however, that even if Mr. Flora's conduct were found to be "severe or pervasive," there is no legal basis to hold Amtrak responsible for his actions.  Tressler argues otherwise, although she appears to concede that Amtrak could only found responsible if: (a) Amtrak knew or had reason to know that Mr. Flora was likely to assault Tressler; or (b) Amtrak failed to take appropriate corrective action after becoming aware of Mr. Flora's actions.  (Pl.'s Opp'n at 10-12).  *Curry*, 195 F.3d at 660; *Roof v. Howard Univ.*, 501 F. Supp. 2d 108, 115 (D.D.C. 2007) ("Where the harassment of an employee by a coworker is at issue . . . the employer can be held liable only if it knew or had reason to know of the harassment and failed to implement any prompt and appropriate corrective action.").  The undisputed evidence establishes that neither of these scenarios exists here.

First, Tressler fails to raise a genuine issue of material fact to suggest that Amtrak knew or should have anticipated that Mr. Flora would engage in any kind of sexually inappropriate behavior toward Tressler, or any other coworker.  Before the assault occurred in March 2008, Mr. Flora had been employed with Amtrak for nearly 30 years with virtually no disciplinary history.  (Dkt. No. 52-15 ("Flora Dep.") at 17; Flora Discipline).  Although Tressler argues that Mr. Flora had a "prior history of violence," she overstates the evidence on this point, which simply shows that Mr. Flora was accused of verbally threatening a male coworker sometime in 1996, that the underlying complaint regarding that incident was subsequently withdrawn, and that Mr. Flora was never disciplined for the incident.  (*Id.*).  Additionally, this verbal altercation occurred more than an entire decade before Mr. Flora's actions against Tressler and hardly

SUMMARY OPINION AND ORDER; NOT INTENDED FOR PUBLICATION
IN THE OFFICIAL REPORTERS

signaled that he was at risk to engage in inappropriate sexual conduct towards female coworkers. *See, e.g.*, *Sutherland v. Wal-Mart Stores, Inc.*, 632 F.3d 990, 995 (7th Cir. 2011) (holding that, while prior complaints of "unwelcome attention" may put an employer on notice of "inappropriate workplace behavior," those complaints did not provide notice that the employee was likely to commit "sexual assault"). More compelling on this issue, however, is the evidence surrounding Tressler's own interactions prior to the assault. During the earlier part of 2008, Tressler rode with Mr. Flora more than ten times without any issues. She also testified that, despite knowing Mr. Flora for twenty years, she "was not fearful of [him] at any point until the afternoon of March 14, 2008," the day on which the assault took place. (Flora Dep. at 30; Dkt. No. 52-20 ("Hearing Testimony") at 102). Accordingly, the Court finds that Tressler fails to raise a genuine issue of material fact to suggest that Amtrak knew or should have known that Mr. Flora would sexually assault Tressler.

Similarly, the Court finds that, once Amtrak became aware of Mr. Flora's actions, it took swift and appropriate disciplinary action to ensure that no similar conduct recurred. The reasonableness of Amtrak's response is informed by "the amount of time that elapsed between the notice and remedial action, the options available to the employer, possibly including employee training sessions, transferring the harassers, written warnings, reprimands in personnel files, or termination, and whether or not the measures ended the harassment." *Roof*, 501 F. Supp. 2d at 115-16 (quoting *Curry*, 195 F.3d at 663 n.17). Here, on the same day Tressler reported the incident, Amtrak began investigating the allegations and contacted Amtrak Police so that it could conduct its own investigation. (Marcelle Decl. at ¶ 10). Amtrak completed its investigation in less than one week, suspended Mr. Flora, issued charges against Mr. Flora, and scheduled a disciplinary hearing to take place. (*Id.* at ¶ 10-11). Following those disciplinary proceedings,

13

SUMMARY OPINION AND ORDER; NOT INTENDED FOR PUBLICATION
IN THE OFFICIAL REPORTERS

Amtrak terminated Mr. Flora's employment effective May 16, 2008.  (*Id.* at ¶¶ 13-18).  Given

that Amtrak took what is essentially the ultimate disciplinary response against Mr. Flora—*i.e.*,

termination—there was nothing else Amtrak could have done to prevent Mr. Flora from further

harassing Tressler.[5]   Therefore, no reasonable jury could conclude that Amtrak failed to take

"appropriate corrective action" after Tressler reported Mr. Flora's assault.

Accordingly, the Court concludes that Amtrak is entitled to summary judgment on

Tressler's hostile work environment claims.

### C.  Retaliation (Counts III and IV)

Title VII also prohibits an employer from discriminating and/or retaliating against an

employee "'because [s]he has opposed any practice' made unlawful by Title II or 'has made a

charge, testified, assisted, or participated' in a Title VII investigation or proceeding."  *Steele*, 535

F.3d at 695 (quoting 42 U.S.C. § 2000e-3(a)).  While the contours of Tressler's retaliation claims

are hardly the model of clarity, she appears to identify two instances of protected activity that

form the basis for her retaliation claims: (1) filing an EEOC charge against Amtrak in December

2006 (and later amending her charge in May 2007); and (2) reporting Mr. Flora's sexual assault

---

[5]       Tressler nevertheless endeavors to challenge the reasonableness of Amtrak's response.
To this end, she attempts to create a factual dispute as to whether Mr. Flora was actually
terminated by Amtrak, citing Mr. Flora's deposition testimony that he continues to receive
disability benefits that he believes are paid by Amtrak.  (Pl.'s Opp'n at 10-11).  Even if the Court
were to credit Mr. Flora's subjective beliefs regarding his employment status with Amtrak—
which, in the face of uncontroverted documentary evidence to the contrary (Flora Discipline at
14-18), the Court is not inclined to do—Tressler misunderstands the relevant inquiry.  Even if
Mr. Flora continues to receive some form of benefits from Amtrak (as Tressler suggests),
Tressler is unable to contest the end result of Amtrak's response: Amtrak's "measures ended the
harassment."  *Curry*, 195 F.3d at 663 n.17.  Hence, there is plainly no genuine dispute of
material fact as to the reasonableness of Amtrak's corrective action.

SUMMARY OPINION AND ORDER; NOT INTENDED FOR PUBLICATION
IN THE OFFICIAL REPORTERS

on March 19, 2008.[6]  (Pl.'s Opp'n at 12-18).  In turn, Tressler alleges that she was subjected to

the following retaliatory conduct on the part of Amtrak: (1) having her pay stopped in October

2007; (2) having her pay stopped in May 2008; and (3) being subjected to the above-described

graffiti beginning shortly after March 2008.  (*Id.*).

Amtrak mounts several attacks to Tressler's retaliation claims.  First, Amtrak argues that

Tressler is unable to pursue at least some aspects of her retaliation claim before this Court

because she failed to timely and properly exhaust her administrative remedies.  Second, Amtrak

asserts that Tressler's retaliation claims fail on the merits because she cannot establish a *prima*

*facie* case of retaliation.  The Court addresses these arguments in turn.


**1.  Exhaustion of Administrative Remedies**

Under Title VII, plaintiffs "must timely exhaust their administrative remedies before

bringing their claims to court."  *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010) (internal

quotations omitted); *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) ("[A] person

complaining of a violation [must] file an administrative charge with the EEOC and allow the

agency time to act on the charge.").  Simply put, "a timely administrative charge is a prerequisite

to initiation of a Title VII action in the District Court."  *Jarrell v. U.S. Postal Serv.*, 753 F.2d

1088, 1091 (D.C. Cir. 1985) (citing *Brown v. Gen. Servs. Admin.*, 425 U.S. 820 (1976)).  This

requirement "serves the important purposes of giving the charged party notice of the claim and

---

[6]      Amtrak's motion also identified a third potentially protected activity upon which Tressler
might rely: her reporting of Mr. Draper's alleged stalking in early 2006.  (Def.'s Mem. at 24).
However, because Tressler did not argue in her opposition brief that her complaints regarding
Mr. Draper constitute protected activity for purposes of her retaliation claims, those allegations
merit no discussion.

SUMMARY OPINION AND ORDER; NOT INTENDED FOR PUBLICATION
IN THE OFFICIAL REPORTERS

'narrowing the issues for prompt adjudication and decision.'"  *Park*, 71 F.3d at 907 (quoting

*Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 472 (D.C. Cir. 1976)).

In this case, Tressler filed her original administrative charge with the EEOC on

December 19, 2006, and she later amended that charge on May 3, 2007.  (12/19/06 EEOC

Charge; 5/3/07 EEOC Charge).  After May 2007, Tressler did not file any other administrative

charges with the EEOC, nor did she further amend her prior charges.  In turn, because the only

charges Tressler filed predate her reporting of Mr. Flora's assault and the alleged retaliatory

conduct that followed, Amtrak argues that Tressler never validly exhausted her administrative

remedies with respect to this component of her retaliation claims.[7]  Amtrak cites to the Supreme

Court's decision in *National Railroad Passenger Corp. v. Morgan* in support of this argument,

which held that Title VII's exhaustion requirement "precludes recovery for discrete actions of

discrimination or retaliation that occur outside the statutory time period."   536 U.S. 101, 105

(2002).  The parties agree that *Morgan*'s holding precludes the pursuit of Title VII claims for

acts that occurred more than 300 days <u>before</u> the EEOC charge was filed, but they disagree over

whether *Morgan* also extends to bar discrete claims that arise <u>after</u> the filing of an EEOC charge.

If *Morgan* does not apply, then the Court is bound by the broader test adopted by our Circuit in

*Park v. Howard University*, which limits Title VII lawsuits to claims that are "like or reasonably

---

[7]      Amtrak also suggests that Tressler failed to exhaust her administrative remedies as to her
allegations that she was retaliated against for filing her original EEOC charge.  In so arguing,
Amtrak points exclusively to the allegations of the Amended Complaint and contends that
Tressler only pleads the original December 2006 charge, but not the May 2007 amendment to
that charge, as the basis for her retaliation claim.  (Def.'s Mem. at 24 n.8).  The Court does not
agree with Amtrak's hyper-technical interpretation.  Not only does this argument belie common
sense, but even if the Court were to accept Amtrak's position, the record establishes that Tressler
<u>did</u> properly exhaust her remedies with respect to the original December 2006 charge.
Specifically, when Tressler amended her charge in May 2007, her declaration expressly
referenced her original EEOC charge and describes what could reasonably be construed as
allegations of harassing and retaliatory conduct she believes was subjected to thereafter.  (5/3/07
EEOC Charge at ¶¶ 46, 48).

SUMMARY OPINION AND ORDER; NOT INTENDED FOR PUBLICATION
IN THE OFFICIAL REPORTERS

related to the allegations of the charge and growing out of such allegations." *Park*, 71 F.3d at

907 (internal quotations omitted). The D.C. Circuit has expressly declined to resolve this

question thus far, *see, e.g.*, *Payne*, 619 F.3d at 65; *Weber v. Battista*, 494 F.3d 179, 183-84 (D.C.

Cir. 2007), although as Amtrak points out, several judges in this District have wrestled with the

issue. (*See* Def.'s Mem. at 23-24) (collecting cases).

On balance, the Court need not wade into these murky waters because, even applying the

more lenient standard set forth in *Park*, Tressler's contention that she was retaliated against for

reporting Mr. Flora's assault—whether by the appearance of graffiti in mid-2008 or Amtrak's

stoppage of her pay in May 2008—is not "reasonably related" to the allegations contained in her

EEOC charges. *Park*, 71 F.3d at 907; *Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1098

(D.C. Cir. 1997) (explaining that the substance of a claim "must fall within the scope of the

administrative investigation that can reasonably be expected to follow the charge of

discrimination"). These allegations are simply too far removed—both in timing and in

substance—from the content of her underlying charges, which were filed nearly a year before

Mr. Flora's assault even occurred and which make no mention whatsoever of any sort of physical

assault against her by a coworker. Thus, to the extent that Tressler relies on her reporting of Mr.

Flora's assault as a predicate "protected activity" for her retaliation claims, her claims cannot

proceed on these grounds.

### 2. The Substance of Tressler's Retaliation Claim(s)

Retaliation claims under Title VII (and the DCHRA) are subject to the three-part burden-

shifting framework of *McDonnell Douglas*. Under this approach, a plaintiff must first establish a

*prima facie* case of retaliation by showing: "(1) that [s]he engaged in statutorily protected

activity; (2) that [s]he suffered a materially adverse action by [her] employer; and (3) that a causal link connects the two." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (citing *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007)).   Thereafter, if the plaintiff is able to satisfy the requirements of a *prima facie* case, the burden shifts back to the employer to articulate a legitimate, non-retaliatory reason for its actions.   *Id.*   If the employer does so, then the burden-shifting framework "disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer intentional . . . retaliation from all the evidence."  *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004).   Here, the Court need not venture past the first step of this analysis because Tressler fails to establish a *prima facie* case of retaliation.

First, the Court already concluded that Tressler failed to properly exhaust her administrative remedies as to any retaliation for internally reporting Mr. Flora's assault in March 2008.  Thus the only "protected activity" that can serve as the predicate for her retaliation claims is the filing of her EEOC charge in December 2006 (and her subsequent amendment of that charge in May 2007).   While there is no dispute that those EEOC charges satisfy the "protected activity" prong of the *prima facie* case, Tressler must also adduce evidence demonstrating a "causal link" connecting her EEOC charges and any adverse actions by Amtrak.  *Jones*, 557 F.3d at 677.   Although Tressler's briefing points to three incidents that she believes amount to adverse actions—(1) her pay stoppage in October 2007; (2) her pay stoppage in May 2008; and (3) the graffiti that began appearing shortly after March 2008—she also alleges that the latter two were done in retaliation <u>for her internal reporting of Mr. Flora's assault</u>, rather than in retaliation <u>for her having filed EEOC complaints</u>.  (*See* Pl.'s Opp'n at 16) ("In addition to having her pay arbitrarily stopped shortly after Ms. Tressler reported the sexual assault, she was also subject to additional acts of retaliation, including the graffiti.").   Consequently, the only claimed "adverse

action" that Tressler even attempts to link to her EEOC charges is Amtrak's withholding of her pay from October 2007 through February 2008.  (Pl.'s Opp'n at 16-17) ("Ms. Tressler's pay was stopped in October 2007, after Amtrak had notice of the [EEOC] charges.").  The Court therefore confines its analysis accordingly, in keeping with the arguments actually advanced by Tressler.[8]

To demonstrate a causal connection, Tressler must show that Amtrak "had knowledge of her protected activity, and that the adverse personnel action took place shortly after that activity." *Holbrook v. Reno*, 196 F.3d 255, 263 (D.C. Cir. 1999).  Even assuming that the temporary delay in Tressler's pay could be considered an actionable adverse action for purposes of Title VII (a point that Amtrak contests), the Court finds that Tressler is unable to establish any causal link between her EEOC charges and Amtrak's decision to withhold her pay.  There is no dispute that Tressler's manager who made that decision, Mr. Mazeika, did not have any knowledge that Tressler filed an EEOC charge until February 2012, more than three years <u>after</u> the adverse action took place.  (Dkt. No. 52-1 ("Mazeika Decl.") at ¶ 12).  Tressler seeks to avoid this result by arguing that, even if Mr. Mazeika was unaware of her protected activity, her direct supervisor, Mr. Wickham, may have known about the EEOC complaints and contributed to and/or caused the withholding of her pay as a result.  (Pl.'s Opp'n at 16-17).  But this argument gets Tressler nowhere, as her speculative assertion cannot overcome Mr. Wickham's sworn declaration confirming that the first time he discovered Tressler had filed any EEOC complaints was similarly not until March 2012.  (Dkt. No. 54-6 ("Wickham Decl.") at ¶ 6).  Thus, because the

---

[8]     Even if the Court were to evaluate these other "adverse actions" on their merits, Tressler would fare no better for the reasons discussed *infra*.  Most significantly, those additional actions are drastically more attenuated in time from the underlying protected activity, having allegedly occurred more than an entire year after she filed her December 2006 EEOC charge (and ten to twelve months after her May 2007 amendment).  Moreover, inasmuch as Tressler's supervisors were completely unaware of her EEOC charges until she initiated this lawsuit, she cannot establish that their decision to withhold her pay in May 2008 was made in retaliation for EEOC complaints, just as with her prior pay stoppage.

SUMMARY OPINION AND ORDER; NOT INTENDED FOR PUBLICATION
IN THE OFFICIAL REPORTERS

undisputed facts demonstrate that neither Mr. Mazeika nor Mr. Wickham were even aware of Tressler's claimed "protected activity" at the time of her pay withholding, she cannot establish the requisite causal connection to establish a *prima facie* case of retaliation.

In addition, the significant passage of time between Tressler's EEOC complaint and her pay suspension further undermines any causal link between the two. In our Circuit, "temporal proximity can indeed support an inference of causation, but only where the two events are very close in time." *Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012) (quoting *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007)). Here, Tressler initially filed her EEOC charge in December 2006, but her pay was not suspended until October 2007, ten months later. Even if the Court were to measure this interval from the date of Tressler's amended charge in May 2007, there is still a five month gap between these events. While there is no bright-line rule on this timing issue, the Court concludes that, under the circumstances of this case, a five- or ten-month gap is too lengthy to establish an inference of causation. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (citing approvingly cases finding three- and four-month intervals insufficient to establish a prima facie case); *Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 118-19 (D.D.C. 2004) (describing three-month window as the "outer limit" of the temporal requirement in a retaliation case). Amtrak is thus entitled to summary judgment on these claims.

### D. Constructive Demotion (Counts V and VI)

As the Court explained in ruling on Amtrak's prior motion to dismiss, "constructive demotion" claims are evaluated as distinct claims of disparate treatment gender discrimination, under which the alleged adverse employment action is a constructive demotion. (Dkt. No. 33 at 4). Thus, the *McDonnell Douglas* burden-shifting framework applies, and a plaintiff must first

SUMMARY OPINION AND ORDER; NOT INTENDED FOR PUBLICATION
IN THE OFFICIAL REPORTERS

establish a *prima facie* case of gender discrimination by showing that: "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination."  *Wiley*, 511 F.3d at 155 (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)).  If the plaintiff does so, the burden shifts to the employer to articulate a "legitimate, non-discriminatory reason" for the challenged employment action, leaving the plaintiff an opportunity to prove that the employer's proffered explanation was not the true reason, but a pretext for discrimination.  *Id.* at158.  Here, Amtrak argues that Tressler's claims fail at the *prima facie* stage because she cannot prove that her "constructive demotion" was an adverse action.

More specifically, Amtrak asserts that Tressler's alleged "demotion" cannot be deemed an adverse action because she <u>voluntarily</u> chose to transfer to a different position in the Washington, D.C. yard.  (Def.'s Mem. at 32-33).  To the extent that Amtrak is suggesting that voluntary employment choices—whether transfers to different positions or otherwise—can never amount to adverse employment actions, the Court does not agree.  Rather, where a plaintiff alleges that she was effectively forced to transfer positions due to a hostile work environment or some other discriminatory treatment, the Court finds that the standard governing constructive discharge claims applies to determine whether the claimed "demotion" amounts to an actionable adverse action.  While the D.C. Circuit has not addressed these types of "constructive demotion" claims, a number of other circuits have adopted this approach.  *See, e.g.*, *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 717 (8th Cir. 2003); *Simpson v. Borg-Warner Auto., Inc.*,

196 F.3d 873, 876-78 (7th Cir. 1999); *Sharp v. City of Houston*, 164 F.3d 923, 933-34 (5th Cir.

1999); *Cuffee v. Tidewater Cmty. College*, 409 F. Supp. 2d 709, 718 (E.D. Va. 2006).[9]

Under District of Columbia law, "a finding of constructive discharge depends on whether

the employer deliberately made working conditions intolerable and drove the employee out."

*Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1558 (D.C. Cir. 1997) (quoting *Clark v.

Marsh*, 665 F.2d 1168, 1173 (D.C. Cir. 1981)).  This inquiry is an objective one: whether "the

working conditions [became] so intolerable that a reasonable person in the employee's position

would have felt compelled to resign," or in this case, to voluntarily "demote" oneself to a

different position. *Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004); *Veitch v. England*,

471 F.3d 124, 130 (D.C. Cir. 2006).  Moreover, the mere existence of workplace discrimination

or a hostile work environment, as alleged here, is not enough, as a constructive discharge or

demotion claim "requires a finding of discrimination and the existing of certain 'aggravating

factors.'"  *Veitch*, 471 F.3d at 130 ("'Aggravating factors' are those aspects of a discriminatory

work environment that, by making the workplace so disagreeable, prevent the reasonable

employee from seeking remediation on the job.")

---

[9]  The Court points out that its prior Memorandum Opinion addressing Amtrak's Partial
Motion to Dismiss identified *Hawkins v. Holder*, 597 F. Supp. 2d 4 (D.D.C. 2009), as having
recognized a "constructive demotion" theory.  Upon further review—and now having the
benefit of a fully-developed factual record at the summary judgment stage—the Court does not find the
*Hawkins* decision particularly applicable here after all.  In *Hawkins*, the plaintiff's "constructive
demotion" claim centered on her employer's reclassification of her existing position to a
particular government pay scale.   In other words, the demotion was characterized as
"constructive" because, even though her title remained the same, Hawkins believed her
employer's changes to the pay scale and/or her responsibilities effectively constituted a
demotion.  *Id.* at 22-23.  Here, by contrast, Tressler's claimed demotion is "constructive" in the
sense that, although she voluntarily sought out a new position within Amtrak, she asserts that she
was effectively forced to do so because of the hostile work environment she experienced in her
former role.  (Am. Compl. at ¶¶ 66-71).  Thus, unlike in *Hawkins*, Tressler's claims are more
akin to claims for constructive discharge, and the Court evaluates her claims along those lines.

SUMMARY OPINION AND ORDER; NOT INTENDED FOR PUBLICATION
IN THE OFFICIAL REPORTERS

Tressler asserts that, because of the hostile work environment allegedly created by Amtrak, she was forced to transfer from her former position with the VRE to a different geographic zone within Amtrak, ultimately accepting a position in the rail yard in Washington, D.C., in January 2007.  (Pl.'s Opp'n at 3-4).  Although Tressler's hourly pay rate remained the same, she alleges that her salary was effectively cut in half because there were fewer hours available in her new position.  She also asserts that her new position had a less desirable schedule, requiring her to work night shifts and weekend shifts.  (*Id.*).  Amtrak suggests that these changes do not amount to an adverse action for purposes of Title VII and responds that, if Tressler did not like the position, she simply could have waited and applied for a different position, as new jobs were advertised on a weekly basis.  (Def.'s Mem. at 32-33).  But even assuming for the moment that these changes to Tressler's working conditions did rise to the level of an actionable adverse employment action, the Court finds that no reasonable jury could conclude that the alleged hostile work environment about which Tressler complains was so "intolerable" that a reasonable person would have felt forced to transfer.

To begin with, the Court already found that Tressler's hostile work environment claims cannot be sustained because there was no evidence to impute responsibility for the allegedly harassing incidents she has identified—the sexually-explicit graffiti and Mr. Flora's assault—to Amtrak.  Of course, those two incidents, which occurred in March 2008 or later, cannot be considered part of the "intolerable conditions" supporting Tressler's constructive demotion claim in any event because they postdate her January 2007 transfer by more than an entire year.[10]  As such, Tressler also relies upon the allegedly harassing behavior of Mr. Draper, and Amtrak's

---

[10]    Despite this, Tressler vaguely alludes to the March 2008 assault in arguing that her constructive demotion claims should survive summary judgment.  (Dkt. No. 53-1 at 19).  As set forth above, to the extent that Tressler argues that these circumstances should be considered in connection with her constructive demotion claims, the Court rejects this argument.

response to her concerns.  But Mr. Draper stopped riding Tressler's route on June 22, 2006—more than six months before she sought to transfer to the Washington, D.C. yard.  (5/3/07 EEOC Charge at ¶ 36).  This significant passage of time severely undercuts the notion that Mr. Draper's actions, and/or Amtrak's response to those actions, constituted a conceivably "intolerable" condition that forced Tressler to transfer to a different position.  While the Court recognizes that Tressler's experience with Mr. Draper may have certainly been uncomfortable, her assertions cannot be reasonably construed as sufficiently "severe" to leave a reasonable employee with no other option than to "demote" herself to another position.  Amtrak is therefore entitled to summary judgment on these claims.

### E.   FELA Claims (Count VII)

The Federal Employers' Liability Act, 45 U.S.C. § 51, *et seq.*, "renders railroads liable for employees' injuries . . . 'resulting in whole or in part from [carrier] negligence.'"  *CSX Transp., Inc. v. McBride*, _ U.S. _, 131 S. Ct. 2630, 2634 (2011) (quoting 45 U.S.C. § 51).  For purposes of FELA, "negligence . . . attaches if the railroad knew, or by the exercise of due care should have known, that prevalent standards of conduct were inadequate" to protect the plaintiff from injury.  *McMillan v. Nat'l R.R. Passenger Corp.*, 648 A.2d 428, 432 (D.C. 1994) (quoting *Urie v. Thompson*, 337 U.S. 163, 178 (1949)).  While a FELA plaintiff is required to prove a failure on the part of the railroad to use reasonable care under the circumstances, "a relaxed standard of causation applies."  *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 543 (1994).  Thus, a plaintiff may prevail on a FELA claim if the railroad's negligence "play any part, even the slightest," in causing the plaintiff's injury.  *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 506 (1957).

In connection with her FELA claim, Tressler seeks to recover for three distinct sets of injuries for which she claims Amtrak is responsible: (1) back pain, headaches, and numbness in her hand allegedly resulting from being forced to change her seating position to avoid a potentially harassing passenger; (2) an injury to her ankle as she was stepping off a train on September 14, 2006; and (3) back pain, headaches, numbness, and other stress-related symptoms, like weight gain, that she attributes to the alleged hostile work environment created or condoned by Amtrak.  (Def.'s Mem. at 33; Pl.'s Opp'n at 19).  Amtrak argues that Tressler's claim should be dismissed because most of these injuries are barred by the applicable statute of limitations.  For those injuries that are not time-barred, Amtrak seeks summary judgment on the grounds that Tressler cannot establish that any of her claimed injuries are the result of Amtrak's negligence.  The Court takes these arguments in turn.

### 1.   Statute of Limitations

FELA claims are subject to a three year statute of limitations.  45 U.S.C. § 56; *Nat'l R.R. Passenger Corp. v. Krouse*, 627 A.2d 489, 493 (D.C. 1993).  FELA's statutory scheme does not define when a cause of action accrues, but when the case involves "a traumatic injury or a single breach of duty and an immediately manifest injury . . . the cause of action accrues at the time the plaintiff's interest is invaded or at the time the tortious act is committed which causes the injury."  *Krouse*, 627 A.2d at 493-94 (citing *Clay v. Union Carbide Corp*., 828 F.2d 1103, 1106 (5th Cir. 1987); *Brassard v. Boston & Maine R.R.*, 240 F.2d 138, 141 (1st Cir. 1957)).  Otherwise, federal courts apply the "discovery rule" to injuries that manifest themselves sometime after the initial cause of the injury, such that a FELA claim accrues "when the injured party discovers the injury and its potential cause."  *Id.* at 495 (citing *Fries v. Chicago & N.W.*

SUMMARY OPINION AND ORDER; NOT INTENDED FOR PUBLICATION
IN THE OFFICIAL REPORTERS

*Transp. Co.*, 909 F.2d 1092, 1094 (7th Cir. 1990)); *see also Matson v. Burlington N. Santa Fe R.R.*, 240 F.3d 1233, 1235 (10th Cir. 2001) (holding that the FELA statute of limitations begins to run when the plaintiff "knows or has reason to know of the existence and cause of the injury which is the basis of his action").

Here, Amtrak argues that the first two sets of injuries that comprise Tressler's FELA claim—(1) her injuries resulting from a potentially harassing passenger, and (2) her ankle injury from stepping off a train—are time-barred because those injuries arose prior to October 28, 2006, outside the statutory period. Although Tressler concedes that these injuries all occurred prior to October 28, 2006, she maintains that they should not be time-barred and argues in conclusory fashion that a jury could somehow conclude that Tressler did not discover Amtrak was the cause of those injuries until later. The Court disagrees.

Tressler attributes her first set of injuries to the uncomfortable position in which she was allegedly forced to sit due to the conduct of a harassing passenger from January 13, 2006 through June 22, 2006. (Am. Compl. at ¶¶ 11-12, 75). Tressler claims that she began suffering back pain, headaches and numbness in her hand as a result, and she started to see a chiropractor for these conditions on April 24, 2006, until October 10, 2006. (5/3/07 EEOC Charge at ¶ 16). According to Tressler, "[t]he chiropractor identified [her] symptoms as stress related and ha[d] indicated that [her] position in [her] chair exacerbated [her] condition." (*Id.*). Therefore, to the extent that she believed that Amtrak's negligence or inaction with respect to this harassing passenger was the cause of those injuries, her own admissions demonstrate that any such belief should have been plainly evident well before October 26, 2006. Tressler's FELA claim as to those injuries is therefore barred by the statute of limitations.

Tressler's second alleged injury—her ankle injury—presents an even easier case.

SUMMARY OPINION AND ORDER; NOT INTENDED FOR PUBLICATION
IN THE OFFICIAL REPORTERS

Tressler alleges that, due to Amtrak's negligence, she injured her ankle when stepping off a train

on September 14, 2006.  (Am. Compl. at ¶ 76; Disability Claim).  This is precisely the type of

"immediate manifest injury" that the D.C. Court of Appeals has observed "poses little difficulty

in determining the commencement of the limitations period" under FELA.  *Krouse*, 627 A.2d at

493-94.  Tressler was plainly aware of her ankle injury and its cause at the time it occurred in

September 2006, outside of the statute of limitations.[11]  Therefore, Tressler's ankle injury is also

time-barred for purposes of FELA.


## 2.  Amtrak's Negligence

Finally, Tressler seeks to recover for injuries she claims to have suffered as a result of the

hostile work environment allegedly created by Amtrak.  In her Amended Complaint, Tressler

identified a number of "stress-related symptoms" she believes derived from the allegedly hostile

work environment, including "back pain, headaches, numbness, [and] ongoing injury to her

ankle."  (Am. Compl. ¶ 77).  She also appears to seek recovery for her alleged weight gain and

for two broken crowns.  (Def.'s Mem. at 35).  To begin with, it is unclear whether many of these

claimed injuries are distinct from those already discussed above.  To the extent they are not, the

Court's prior analysis plainly dispenses with those claims.  But even if these injuries manifested

themselves at a later time or derived from different alleged conduct on the part of Amtrak,

Tressler still cannot prevail under FELA.

Tressler specifically argues that she can recover for injuries arising out of the sexual

assault by Mr. Flora.  (Pl.'s Opp'n at 20).  However, Tressler can only recover for these injuries

---

[11]     Amtrak alternatively argues that the Court should calculate the statute of limitations from
the date of the Tressler's Amended Complaint, since her original complaint made no mention of
any ankle injury.  (Dkt. No. 52 at 35 n.15).  Because Tressler's claim is time-barred under either
analysis, however, the Court need not reach this issue.

SUMMARY OPINION AND ORDER; NOT INTENDED FOR PUBLICATION
IN THE OFFICIAL REPORTERS

under FELA: (1) if Mr. Flora perpetrated the assault within the scope of his employment and in

furtherance of Amtrak's duties, or (2) if Amtrak was negligent in failing to prevent that assault.

*See Brooks v. Wash. Terminal Co.*, 593 F.2d 1285, 1288 (D.C. Cir. 1979); *Persley v. Nat'l R.R.*

*Passenger Corp.*, 831 F. Supp. 464, 468 (D. Md. 1993) (citing *Sowards v. Chesapeake & Ohio*

*Ry. Co.*, 580 F.2d 713, 715 (4th Cir. 1978)).  Tressler does not argue that Mr. Flora was acting

within the scope of his employment when he assaulted her, which means that she can only

prevail by demonstrating that Amtrak was negligent.  This she cannot do, given that the Court

already found that Amtrak had no reason to know that Mr. Flora was likely to assault Tressler.

Accordingly, even assuming Tressler could satisfy the other common law elements of

negligence—*i.e.*, duty, breach, and causation, *McDavitt*, 804 A.2d at 283-84—she cannot

demonstrate that Mr. Flora's assault was foreseeable.  *Brooks*, 593 F.2d at 1289-90 (finding no

FELA liability for coworker assault where the incident was not foreseeable); *Persley*, 831 F.

Supp. at 468 (same).  In sum, Tressler fails to raise a genuine issue of material fact from which a

reasonable jury could conclude that Amtrak negligently failed to prevent the injuries she claims

to have suffered as a result of Mr. Flora's assault.


## **CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED.

An order accompanies this Memorandum Opinion.


Date:  November 30, 2012


_____
ROBERT L. WILKINS
United States District Judge